[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action to reform the will of Seth Smith under date of December 15, 1876, whose bequest provided funding to purchase and operate The Smith Memorial Home ("the Home") in New London. As required by the will, the Home is a charitable institution which has been operated as a residence for indigent, elderly women who have been residents of New London. Due to the near exhaustion of the fund to operate the home, plaintiff herein seeks an order of the court allowing the real property and personal property of the Smith Memorial Home, Inc. to be liquidated and to use all of the present funds and those realized from any liquidation of the Home to provide grants for charitable institutions who will provide for the needs of aged, respectable, indigent women who have been residents of the City of New London. The Connecticut Uniform Management of Institutional Funds Act, Connecticut General Statutes section 45-100o, and the common law doctrine of Cy Pres provide ample legal support for this Court to grant the orders requested.
The Smith Memorial Home was established in CT Page 3215 accordance with the provisions of the will of Seth Smith dated December 15, 1876. The residue of Dr. Smith's estate was held by his trustees until a corporation was established to operate "a home for aged, respectable, indigent women, who have been residents of the City of New London, under such regulations as may be described or provided by such act of incorporation". In 1881 the plaintiff corporation was established by an act of the Connecticut General Assembly for the purpose of creating such a home for aged, respectable, indigent women, who have been residents of the City of New London. With funds from the Smith estate, the corporation established and has been operating such a home since 1884.
The will of Seth Smith gives a pecuniary bequest of $1,000.00 to Dr. Smith's niece and then gives his house and household goods to his wife, Susan T. Smith. He also gave his wife exclusive use of the rest and residue of his estate until she died or remarried, provided, however, she could not use more than $4,000.00 per year. Dr. Smith also left a remainder interest in the residue to any children as may have been born to him after the signing of the will. Dr. Smith died in April, 1878, leaving no issue, and his wife died in October, 1880.
The residue of Dr. Smith's estate after the death of his wife was to be divided as follows: (1) $5,000.00 to the Second Congregational Church of New London, the annual income therefrom for keeping his burial plot in Cedar Grove Cemetery and the remainder interest for the maintenance and support of the church; (2) $1,000.00 the annual income therefrom to the East Lyme Congregational Church for the maintenance of the burial plot of his father's family and the remainder interest of any such income to the maintenance and support of that church; and (3) the remainder of the rest and residue of the estate was to go to the creation of the Smith Memorial Home. The will also states that if the respective churches do not maintain the burial plots, those funds are to be given to the Smith Memorial Home. The will contains no right of reverter or a gift over upon the failure of the charitable bequest creating the Home and no gift over to another beneficiary upon the Home ceasing to operate.
Dr. Smith was a physician. He also was associated with another doctor in conducting a drug store and apothecary shop on State Street in New London. Dr. Smith had a large medical practice in the city and neighboring towns. An interview with Mrs. Ann Morgan recorded in The Day newspaper in the 1930's (Plaintiff's Exhibit P) indicates that Dr. Smith had a strong place in his heart for elderly people, particularly elderly women. To those who were unable to pay for his ministrations because of age or infirmity, his CT Page 3216 sympathy forbade his charging fees for his medical services. Dr. Smith was a man of very simple taste, but very much up to date in all matters, and extremely friendly in social contact. He was generally liked and was one of the leading citizens of New London in his day.
In 1884 the Home was established at the corner of Union and Masonic Streets, where the current New London post office is located. In 1932 the plaintiff corporation built a new home at the corner of Williams Street and Vauxhall Street in New London, where the home is located today. The current home consists of 22 private rooms for residence. All meals, housekeeping, linens, and laundry service were provided by the home to the residents. The Home provided 24-hour service, but there was no nursing home care or skilled care on the premises.
The fund used to operate the Home has dwindled down to approximately $50,000.00 as of September 9, 1990. The plaintiff gave the residents notice of the dwindling funds and the possibility of closing the Home in both July and August, 1990 as required by the State Health Department. As of August 31, 1990, there were no residents residing at the Home.
During the 1980's the Home experienced a substantial reduction in its fund used to operate the Home. Despite its ability to accommodate up to 22 residents, the Home typically accommodated an average of 18 residents. The promise to take care of the residents after they came to the Home proved financially impossible to fulfill. The need for some residents to move to nursing homes for more skilled care — paid for by the plaintiff — resulted in a staggering outlay for such care. Medical insurance and medical expenses of the residents also dramatically increased. The cost of maintaining a 1932 building and other overhead, particularly labor and insurance, compounded the deficit between income and expenses. Although the plaintiff raised the fees charged to residents, sought to increase the number of residents, and did whatever was possible to run the Home efficiently, it was unable to abate the precipitous decline in the operating fund.
Due to the inevitable closing of the Home, the plaintiff brought this action seeking the court's permission to cease operating the Home, liquidate the real and personal property of the Home, and create a fund for grants to charitable organizations that will provide for the needs of aged, respectable, indigent women who have been residents of the City of New London. Only by granting the relief requested can the intent of Dr. Smith's will be served, albeit in a CT Page 3217 different fashion, and the complete frustration of that intent be avoided.
In 1973, Connecticut adopted the Uniform Management of the Institution Funds Act, Connecticut General Statutes section 45-100h, et seq., which includes a provision allowing the release of a restriction in a gift instrument by court order. Specifically, section 45-100o provides, in pertinent part, as follows:
 (b) If written consent of a donor cannot be obtained by reason of his death, disability, unavailability or impossibility of identification, the governing board may apply, in the name of the institution, to the superior court for a judicial district in which the institution conducts its affairs for release of a restriction imposed by the applicable gift instrument on the use or investment of an institutional fund. The Attorney General shall be notified of the application and shall be given an opportunity to be heard. If the Court finds that the restriction is obsolete, inappropriate, or impracticable, it may by order release the restriction in whole or in part.
Connecticut General Statutes section 45-100o(b) (1989 rev.) This statute provides a basis for releasing restrictions on the use of funds held by an institution for its exclusive use, benefit or purpose. Connecticut General Statutes section 45-100i(2). A fund can include real estate and other tangible property because the term "gift instrument" refers to deeds and conveyance and is not limited to intangible funds held at a bank or other investment institution. See Connecticut General Statutes section 45-100i(6).
The drafters' comments to the Uniform Act support the conclusion that the statute was intended to allow for the release of restrictions on the use of gift funds on a liberalized basis. The comment provides, in pertinent part:
 One of the difficult problems of fund management involves gifts restricted to uses which cannot be feasibly administered or to investments which are no longer available or productive. There should be an expeditious way to make necessary CT Page 3218 adjustments when the restrictions no longer serve the original purpose. Cy pres has not been a satisfactory answer and is reluctantly applied in some states . . . This section permits a release of limitations that imperil efficient administration of a fund.
The interpretation of a statute is a question of law. Gordon v. Bridgeport Housing Authority, 208 Conn. 161,172-173 (1988). The Court has located no reported decisions, in Connecticut[1] or elsewhere, interpreting the statutory language "obsolete, inappropriate, or impracticable." The legislative history of the Act sheds no light on the interpretation of these words. The statute must be construed to carry out the legislature's intent. Aaron v. Conservation Commission, 183 Conn. 532, 548 (1981). Evidence of legislative intent to which courts may refer includes the words used (City of Hartford v. Hartford Theological Seminary, 66 Conn. 475,484 (1985)), the policy served (Aaron v. Conservation Commission, supra, 183 Conn. at 538), and the law's purpose (Austin v. Housing Authority, 143 Conn. 338, 345 (1956)). Ordinarily, however, legislative intent is best obtained by reading the words of a statute in their general and popular sense. City of Hartford v. Hartford Theological Seminary, supra, 66 Conn. at 484. In other words, common sense is crucial to proper statutory construction. Cilley v. Lamphere,206 Conn. 6, 12 (1988).
The challenged restriction in this case is both obsolete and impracticable under any definition of these words. Black's Law Dictionary defines obsolete as "that which is no longer used; disused, neglected, not observed." See Black's Law Dictionary, Fifth Edition, at 972 (West 1979). The restriction is obsolete because the Home no longer serves the purpose it did in the 1800's. Welfare, Medicare, Medicaid, and other entitlement programs did not exist at the time Dr. Smith wrote his will. The vast network of private and governmental programs enabling elderly citizens to stay in their home also did not exist. Matters such as the Social Security Act of 1932, the widespread use of antibiotics, the amendments to the Social Security Act in the 1950's, the White House Conference on Aging in 1951, the implementation of Medicare and Medicaid in 1965, the Older Americans Act in 1965, Medicare reforms and changes occurring in 1972, the Omnibus Reconciliation Act in 1981 and the Tax Equity and Fiscal Responsibility Act in 1982 were all social changes which the late Dr. Smith could never have envisioned. The entry of government into this field was foreign to the era of the late Dr. Smith. CT Page 3219
The credible testimony presented to the Court by the Home's financial adviser, the testimony presented by the assistant director of the Visiting Nurses Association, the minutes of the Board, the testimony of the last administrator of the Home, and the testimony of the President of the Board of Directors all paint a picture of the effect and impact of present day social and medical policies, governmental and otherwise, and practical and realistic problems with regard to the ongoing maintenance and care of the existing gracious physical plant. Granting the plaintiff's request to create a fund from which to make grants to charitable organizations providing for elderly women would enable the Smith bequest to update its services to meet the changing desires and needs of elderly, indigent women.
The word "impracticable" has been defined as "not capable of being done or carried out". See The American Heritage Dictionary of the English Language, New College Edition, at 661 (1976). To require the plaintiff to continue operating the Home or accumulating funds so that it can operate the Home would not be practical. With the expense of running the Home consistently exceeding income and only $50,000.00 left in the Home's operating fund, the Home would inevitably have to close forever.
Furthermore, it is inappropriate by every reasonable standard to keep the Home open, though unoccupied, and waste assets which could be used to benefit the people Dr. Smith wanted to help.
The Superior Court, as a court of equity, possesses the power to carry out the general intent of the donor of a testamentary charitable bequest, when clearly manifested, so the particular form or manner pointed out by the testator cannot, because of changed circumstances be followed. Newton v. Healy, 100 Conn. 5, 10 (1923). The doctrine of cy pres, or of approximation, arises out of and is limited by the necessities of the particular case, and exists only when, and insofar as, the specific method adopted by the testator for carrying his general intent into effect can no longer be executed. In such cases the necessity of preserving and effectuating the general charitable purpose of the testator justifies the substitution of a method which seems to be as nearly approximate as existing conditions will permit. In this case Seth Smith had a general charitable intent to benefit the indigent, elderly women of New London and the method he chose, i.e., a home for them, can no longer be executed due to changed circumstances. Allowing the plaintiff to liquidate its real and personal property and to create a fund from which to make grants to charitable organizations to provide for the CT Page 3220 needs of aged, respectable, indigent women from New London would as nearly approximate his charitable purpose as existing conditions will permit.
Like the will in Citizens and Manufacturers National Bank v. Guilbert, 121 Conn. 520 (1936), the scheme of Seth Smith's will as a whole indicates a general charitable intent. Besides bequeathing money to create the Smith Memorial Home, he also gave money to the Second Congregational Church of New London and the East Lyme Congregational Church. Moreover, the will contains a general residuary clause to charities as did the will in the Citizens and Manufacturers National Bank case. Moreover, the plaintiff in this case seeks to create a fund for giving grants to charitable organizations that will benefit those envisioned in Seth Smith's will while at the same time preserving the memory of Seth Smith by calling the fund The Smith Memorial Fund. Moreover, it would be impracticable to require the continued operation given the small amount left in the operating fund and the history of expenses exceeding the income. The plaintiff would be required to accumulate sufficient funds to re-establish and maintain the Home (then probably to have deficits recur and erode the fund again), while the aged, indigent women in New London are deprived of any benefit.
In contrast to this case, in Howood House, Inc. v. Trustees of Donations and Bequests, 27 Conn. Sup. 176 (1967), the Peabody will did state that it was to benefit women patients in any institution maintained by the corporation: the language in Peabody clearly showed that it was not given for the benefit or support of a particular corporation. Nevertheless, the court also looked at the number of charitable bequests in the will and found a general charitable intent. Furthermore, the presence of a general residuary clause showed an intent to give the bequest to charity absolutely without the possibility of intestacy. Id. at 188. The court in Howood found that Hartford Hospital was an appropriate substitute beneficiary because it approximated the type of institution that the plaintiff was at the time that the testatrix made her will. Id. at 189.
Like the Howood House case, Seth Smith's will indicates a general charitable intent due to its general residuary clause and the number of its charitable bequests. Dr. Smith also was very sympathetic to poor, elderly women in general in his medical practice. Although Dr. Smith's gift is directly for the support of the plaintiff, the general presumption, applied in Howood, that the testator's designated purpose was more important than his choice of organization applies to Dr. Smith's will. Finally, the reasons for the CT Page 3221 dissolution of the Howood House are similar to the reasons for the plaintiff's difficulties.
The case of Shannon v. Eno, 120 Conn. 77 (1935) also lends support for releasing the Smith will restriction. Anna Eno executed a will in which she devised real estate to be used for an Old Ladies' Home for worthy, poor Protestant women over 65 years of age residing in the towns of Ansonia, Derby and Seymour. The court found that the devise and bequest was insufficient to carry out the purpose of the testatrix in accordance with the language in the will. Id. at 89. The court held that the essential foundation for the application of the pres doctrine is the same whether the defect in the method of administering a bequest is present at the time of his death or arises later. Id. at 87. The court found that the dominant purpose of the testatrix was to provide assistance in the form of shelter, food and care. Id. at 89. The court did not refer to any provisions in the will which expressed a dominant purpose or indicated a general intent as opposed to a particular intent. The court ruled that it was not possible to carry out the terms of the bequest but that the purpose should not be defeated if, in substance, it may be served in another way. Id. at 89. The Shannon court directed that the trust income should be used not for a new home for the elderly but by a hospital for the shelter, support and care of women within the class described. The court found a general charitable intent and allowed the hospital to sell real estate to provide a fund to care for the women described in the will. Although the power to sell the real estate was based on a state statute regarding trusts (which is now Connecticut General Statutes section 52-498) the court in its use of equity powers should come to the same result for the plaintiff's charitable corporation.
As discussed above, the Connecticut General Statutes section 45-100o and the cy pres doctrine empower this court to release the restriction that the plaintiff's assets be used to operate a home for aged, indigent, New London women, and to allow sale of the plaintiff's real property and tangible personal property and use of the income from plaintiff's assets for grants to charitable organizations who will provide for the needs of Dr. Smith's intended beneficiaries. The restriction in the will is obsolete, impracticable, and no longer appropriate. The proposed liquidation and application of funds would most nearly approximate the intent of Seth Smith.
On the basis of the foregoing the Court then grants:
1. Release of the restriction in the will of Seth CT Page 3222 Smith, dated December 15, 1876, that the assets held by the plaintiff be used for "a home for aged, respectable, indigent women, who have been residents of the City of New London".
2. Grants permission to liquidate the real property and personal property belonging to the plaintiff and used in the operation of The Smith Memorial Home at 7 Vauxhall Street, New London, Connecticut.
3. Grants permission to hold the assets of the plaintiff in a perpetual trust fund bearing the name "The Smith Memorial Fund," the trustee of which shall be the plaintiff, and the income of which shall be used for grants to charitable organizations who will provide for the needs of aged, respectable, indigent women who have been residents of the City of New London. The plaintiff shall have the power to manage the trust fund as funds are allowed to be managed by its charter, and any amendments thereto. Should there be at any time income above what is needed for the proper expenses of and grants made by the plaintiff, the plaintiff may add the same to the principal of the fund.
AUSTIN, JUDGE